# Exhibit 1

State Court Complaint

1

COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX, SS MIDDLESEX SUPERIOR COURT

PARIKSHIT GAIKWAD
Plaintiff

v.

AMBER HANSON
Defendant

CIVIL ACTION NO. 25-2732

11/3/2025 RECEIVED

## COMPLAINT AND JURY DEMAND

### i. Introduction

1. In November, 2023, Plaintiff Parikshit Gaikwad ("Mr. Gaikwad") initiated a lawsuit against Defendant Amber Hanson ("Ms. Hanson") arising from Ms. Hanson's knowing and intentional effort to ruin Mr. Gaikwad's life through the fabrication of claims of sexual assault and then ultimately the creation of a defamatory website and social media campaign. See Civil Action No. 2381CV03289.

2. Shortly after Mr. Gaikwad's lawsuit was commenced, Ms. Hanson knowingly elected to escalate her cruisade, hoping to end the Middlesex Superior Court lawsuit which had been commenced against her and to succeed in what she had previously failed do to: have Mr. Gaikwad prosecuted, jailed and ruined.

3. Toward that end, in or about the early 2024 time period, Ms. Hanson hatched a scheme to visit law enforcement in Florida (where she was then living) falsely claiming that she had been harassed and threatened by Mr. Gaikwad from Massachusetts. Ms. Hanson's claim was completely fabricated and created by and through the manufacturing of false and fictitious evidence. With this false evidence, Ms. Hanson visited a Florida court and knowingly lied under

oath in order to obtain an ex parte restraining order. Ms. Hanson knew that her actions would lure Mr. Gaikwad from his home in Massachusetts to Florida to defend himself against the baseless charges. Ms. Hanson knew that Mr. Gaikwad was without contacts and resources in Florida to defend himself and she hoped and expected that his incarceration would serve not only to end the Middlesex Superior Court litigation pending against her but also to see to it that Mr. Gaikwad's life was destroyed.

4. Ms. Hanson's plot was initially successful. Upon his arrival in Florida to defend himself against Ms. Hanson's perjurious and fabricated claims, Mr. Gaikwad was promptly arrested and jailed causing him profound, significant and severe harm.

5. After Mr. Gaikwad's arrest and incarceration, the police investigation continued and ultimately revealed that Ms. Hanson had fabricated the evidence used to charge and jail him. The police investigation determined that Ms. Hanson had made knowingly false police claim and lied to the Court in order to harm Mr. Gaikwad, among other criminal misconduct. Ultimately, the State of Florida charged Ms. Hanson with seven felonies, including perjury, making a false police report, fabricating evidence, harassing Mr. Gaikwad and obstruction of justice. In August, 2025, Mr. Hanson pled guilty to each of the seven felony charges and ultimately sentenced her to serve time in jail.

6. By and through this action, Mr. Gaikwad seeks significant damages arising from Ms. Hanson's ongoing and pervasive campaign of criminality against Mr. Gaikwad and her knowing, intentional and criminal misconduct directed against him.

## **ii. Parties**

7. The Plaintiff Parikshit Gaikwad ("Mr. Gaikwad") is in an individual residing in Holliston, Middlesex County, MA.

8. The Defendant Amber Hanson ("Ms. Hanson") is an individual who resides at 10047 Remmington Drive, Riverview, Florida.

## iii. Jurisdiction & Venue

9. The Superior Court has jurisdiction over this action under G.L. c. 212 § 4 and the amount in controversy exceeds $50,000. The Court has jurisdiction over Ms. Hanson as she intentionally hatched a fraudulent scheme to lure Mr. Gaikwad from Massachusetts to Florida on the basis of fabricated claims made to law enforcement and courts in order for Mr. Gaikwad to be jailed and prosecuted. Ms. Hanson did so in order to ruin Mr. Gaikwad and also to end the lawsuit Mr. Gaikwad had commenced in this Court in November, 2022. See G.L. c. 223A, § 3(c) ("A court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a cause of action in law or equity arising from the person's ... (c) causing tortious injury by an act or omission in this commonwealth....")

10. Middlesex County is the proper venue as the Plaintiff resides in this county..

## iii. Facts

### *Mr. Gaikwad and Ms. Hanson Dating Relationship*

11. Mr. Gaikwad holds a Bachelor of Engineering Degree from the University of Pune (India), a Master of Science Degree in Electrical Engineering from Mississippi State University, and a Master of Business Administration Degree from the University of New Orleans.

12. Mr. Gaikwad has had a 20-plus year successful corporate career in product development, product management & strategy for $50M+ projects/portfolios in building device connectivity, digital health and data science solutions.

13. In or around April 2022, Mr. Gaikwad, who is divorced with one son, met Ms. Hanson on a dating app, Bumble. They met for the first time on April 21, 2022, and she told him she was divorced. This was Ms. Hanson's first known lie. As it turns out, since she was and

remains married to Travis Hanson.

14. Mr. Gaikwad and Ms. Hanson began dating. They texted often and, initially, saw each other once or twice a week during the spring, a busy travel time for Mr. Gaikwad, who had a number of work commitments abroad.

15, Ms. Hanson also told Mr. Gaikwad that she was working as the Associate Director of Foreign Policy as part of a 20 person team working on Michelle Obama's nascent 2024 Presidential Campaign. This too was a lie.

16. As their romantic relationship evolved, Ms. Hanson began fabricating a series of supposedly catastrophic health crisis. Among other things, she claimed that in July, 2022 that she had become pregnant and required an abortion. Ms. Hanson likewise claimed that she had significant business connections and wished to connect Mr. Gaikwad with her contacts. She claimed, for example, to have had a business relationship with Peter Thiel and wished to make an introduction so Mr. Gaikwad could pitch his proposed business start-up. In fact, Ms. Hanson had no relationship with Mr. Thiel.

17. Ms. Hanson even went so far as to fabricate a business dinner for Mr. Gaikwad to meet Mr. Thiel. Predictably, Mr. Thiel never showed up. That, however, did not slow Ms. Hanson down. Over the next several weeks in the fall of 2022, Ms. Hanson claimed to be arranging a substantial investment from Mr. Thiel in Mr. Gaikwad's start up, going so far as to generate multiple fraudulent term sheets and even a job offer on supposed letterhead of Mr. Thiel's private equity fund, Founders Fund. The fraudulent term sheets and fake job offer were sent by a non-existent attorney whose website domain was created by Mr. and Ms. Hanson the day before the communications were sent. Metadata from the documents demonstrate that the corporate documents were fraudulently prepared by Ms. Hanson to create the illusion that she actually had a relationship with Mr. Thiel.

18. Over the same time period, Mr. Gaikwad and Ms. Hanson continued engaging romantically. For example, following their September 18, 2022 romantic interaction, Ms. Hanson texted Mr. Gaikwad: "and before I forget, the sex was great today." The two had romantic interactions thereafter on September 21 and 22, 2022.

19. Over this time however, Mr. Gaikwad began growing more and more concerned about Ms. Hanson and the fact that many of her claims were simply not credible.

20. On September 24, 2022, Ms. Hanson texted Mr. Gaikwad professing: "I love you more and more everyday and respect you more and more as well!"

21. Mr. and Mrs. Hanson's relationship ended shortly after Ms. Hanson scheduled a Zoom call with President Obama so the former president could speak with Mr. Gaikwad's son. However, instead of the former President, a well-known impersonator appeared on screen playing the role of President Obama.

22. Mr. Gaikwad had had enough and informed Ms. Hanson that he was ending the relationship. Ms. Hanson did not take the news of their break up well.

**<u>Ms. Hanson's Fabricates Claims That Mr. Gaikwad Sexually Assaulted Her & Launches A Defamatory Website and Social Media Campaign</u>**

23. Two days after Mr. Gaikwad broke up with Ms. Hanson, Ms. Hanson claimed to Mr. Gaikwad, again, that she was pregnant. This was yet another lie.

24. Ms. Hanson's behavior became more and more erratic (and menacing) over the following days and weeks.

25. As a result, on October 7, 2022, Mr. Gaikwad visited the Holliston Police Department to file a complaint about Ms. Hanson. Three days later Ms. Hanson showed up at the police station at approximately 1 PM wearing her pajamas.

26. Ms. Hanson then began appearing unwelcome at Mr. Gaikwad's home and contacting Mr. Gaikwad's father, ex-wife and other professional contacts informing them that she

was pregnant with Mr. Gaikwad's child. None of this was true.

27. Fearing for his safety and the safety of his child, Mr. Gaikwad filed an application for a restraining order. In response and the following day, Ms. Hanson filed her own restraining order application against Mr. Gaikwad, although she neglected to mention anything about allegedly being sexually assaulted or raped on September 18, 2022. This claim would come much later.

28. The Massachusetts Court dismissed Ms. Hanson's restraining order application.

29. Ultimately Ms. Hanson fabricated a claim to Massachusetts law enforcement that she had been sexually assaulted by Mr. Gaikwad on September 18, 2022, the same day where she had texted Mr. Gaikwad: "and before I forget, the sex was great today."

30. Ms. Hanson's claim was fabricated and false. Given her utter lack of credibility, law enforcement in Massachusetts did not bring charges against Mr. Gaikwad arising from Ms. Hanson's claim and all attempts by Ms. Hanson to seek and obtain restraining orders from a variety of state district courts in Massachusetts were denied.

31. Undeterred by intent upon destroying Mr. Gaikwad at any cost, Ms. Hanson, with her husband's assistance, escalated her malicious actions directed by launching a website, www.parigaikwad.com, which included a photo of Mr. Gaikwad and a claim that she had been sexually assaulted by him on September 18, 2022 (which by this time had occurred months and months earlier).

32. Ms. Hanson hired a company to launch the website and to optimize the search results through Google. In other words, Ms. Hanson paid money to have her defamatory website be more visible to individually surfing the Internet. Ms. Hanson did not stop with the website. Ms. Hanson published a blog including the false claims under an alias (Alison Summer) promoting the website. She then published a series of fake Facebook, Instagram and LinkedIn pages in Mr. Gaikwad's name which linked back to the defamatory website. Ms. Hanson's fake LinkedIn

profiles were established so messages and connection requests could be sent to Mr. Gaikwad's professional connections on LinkedIn with a link to the defamatory website. Mr. Hanson then amplified and republished these false claims on his Facebook page.

33. In all, and as was expected, Mr. and Mrs. Hanson's defamatory crusade against Mr. Gaikwad has had a devastating impact on him, his reputation and his emotional health and well-being.

34. As a result of her misconduct, in November, 2022, Mr. Gaikwad commenced a lawsuit in Middlesex Superior Court against Ms. Hanson. This matter is encaptioned Gaikwad v. Hanson, Civil Action No. 2381CV03289 (Middlesex Superior Court) and remains pending. A true and accurate copy of Mr. Gaikwad's amended complaint in the Middlesex Superior Court action is attached hereto as Exhibit A.

**Ms. Hanson's Post-Lawsuit Behavior Results In Further Intentional Actions Directed Against Mr. Gaikwad Which Ultimately Leads To Ms. Hanson's Felony Criminal Convictions**

35. Ms. Hanson's crusade to ruin, destroy and have Mr. Gaikwad jailed only escalated after Mr. Gaikwad commenced his civil suit against her. Ms. Hanson's actions were driven, at least in part, by her desire to end the Middlesex Superior Court lawsuit which Mr. Gaikwad had brought against her.

36. Among other things, in or around early 2025, Ms. Hanson hatched a plan to falsely accuse Mr. Gaikwad of harassment and making criminal threats against her.

37. Specifically, Ms. Hanson falsified and fabricated evidence and accused Mr. Gaikwad of sending her multiple, threatening messages from multiple virtual phone numbers. As the police would later learn, Ms. Hanson created these phone numbers and sent those messages in order to frame Mr. Gaikwad.

38. Ms. Hanson then filed a knowingly false police report and as well sought a

restraining order from a Florida court on the basis of this fabricated evidence and perjurious testimony.

39. As a result of Ms. Hanson's claims and the falsified evidence and testimony she presented, detectives with the Hillsborough County Police Department obtained a warrant for Mr. Gaikwad's arrest.

40. By this time, Ms. Hanson's lies had caused the Florida court to enter an ex parte restraining order against Mr. Gaikwad. Ms. Hanson knew, particularly in light of her failed attempts to seek restraining orders against Mr. Gaikwad in Massachusetts, that following her obtaining of an ex parte restraining order, Mr. Gaikwad would be summoned to Florida to participte in a two-party hearing. Ms. Hanson knew that by luring Mr. Gaikwad to participate in the two party hearing to defend himself, he would be promptly arrested and jailed. Indeed, this is precisely what happened.

41. Ms. Hanson lured Mr. Gaikwad from his home in Massachusetts to participate in a restraining order hearing which Ms. Hanson had initiated.

42. Ultimately, Ms. Hanson's restraining order request was denied by the Florida court.

43. However, and just as expected, on March 27, 2024, upon Ms. Gaikwad traveling to Florida to defend himself against the restraining order, Mr. Gaikwad was arrested and charged by law enforcement in Court and charged with felony harassment. The criminal matter associated with Mr. Gaikwad's criminal case was: State of Florida v. Parikshit Gaikwad, Case No. 24-CF-004589-A.

43. Upon his arrest, Mr. Gaikwad was handcuffed and placed in chains in the courtroom and taken to jail. As he was taken to jail, Mr. Gaikwad was inconsolably crying from the trauma. He was placed in the holding cell with another person and, after several hours, was placed in a van with five other individuals who had been charged with crimes. The van was completely dark and

Mr. Gaikwad's hands were in chains.

44. Mr. Gaikwad was all alone in a jurisdiction where he had no friends, family or support, He felt helpless, angry, terrified, anxious, depressed all at the same time. He was then taken to the first holding facility where he was stripped naked and subjected to a humiliating body search. His clothes are taken away and he was provided with an orange jump suit. Mr. Gaikwad was held in the first prison facility for approximately 16 hours.

45. In the middle of the night, Mr. Gaikwad was asked to line up, was shackled and placed in a second van. The van moved Mr. Gaikwad to a second prison facility where he was placed in another jail cell. After being held for many more hours, Mr. Gaikwad's bail was arranged and he was released.

46. Mr. Gaikwad was released from prison nearly two days after his arrest on March 29, 2024.

47. Thereafter, law enforcement continued their investigation. Law enforcement reviewed, among other things, CCTV footage, phone records and cell phone location history to further investigate the charges which had been brought against Mr. Gaikwad.

48. Mr. Gaikwad was subjected to an under-oath interview to prove his innocence.

49. Ultimately, on January 10, 2025, nearly ten months after being charged, the State of Florida dismissed the felony charge which had been filed against Mr. Gaikwad.

50. The entire experience traumatized Mr. Gaikwad and caused him to suffer severe emotional distress; distress which continues through today.

51. So too, Mr. Gaikwad was forced to incur significant costs and expenses, including the cost of retaining criminal defense counsel to defend against Ms. Hanson's fabricated charges.

52. The police investigation concluded that Ms. Hanson had fabricated the evidence against Mr. Gaikwad and that she was the one who had herself sent the harassing and threatening

text messages.

53. As a result, on January 27, 2025, Ms. Hanson was arrested and charged by the State of Florida with seven felonies, including unlawful use of a two way communication device, perjury in an official proceeding, fabricating evidence, falsely reporting a crime (two counts), harassment and obstruction of justice. The matter was encaptioned: STATE OF FLORIDA VS HANSON, AMBER MELISSA Case Number: 25-CF-001369-A.

54. Ms. Hanson, in fact, unlawfully used a two way communication device in an effort to fabricate evidence to use to have Mr. Gaikwad charged.

55. Ms. Hanson, in fact, committed perjury in an official proceeding, specifically an injunction hearing in the State of Florida.

56. Ms. Hanson, in fact, presented fabricated evidence to law enforcement which led to Mr. Gaikwad's arrest.

57. Ms. Hanson, in fact, falsely reported a crime to law enforcement in Florida regarding Ms. Gaikwad.

58. Ms. Hanson, in fact, harassed Mr. Gaikwad.

59. Ms. Hanson, in fact, obstructed justice.

60. Ms. Hanson, in fact, actually committed the conduct which underlay each of the felony charges that she was charged with committing.

61. On August 13, 2025, Ms. Hanson pled guilty to all felony charges brought against her in Case Number: 25-CF-001369-A. See Exhibit B.

62. Ms. Hanson pled guilty to the felony charges brought against her in Case Number: 25-CF-001369-A because she was, in fact, guilty of the charges which were brought against her.

63. Ms. Hanson was sentenced for her crime to a period of incarceration.

64. Ms. Hanson's actions undertaken against Mr. Gaikwad were undertaken

intentionally, knowingly and with malice.

**COUNT I**
**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

65. Mr. Gaikwad repeats and realleges the allegations in each of the foregoing paragraphs as if explicitly stated herein.

66. Ms. Hanson's actions described above, including but not limited to her fabrication of evidence and presentation of false testimony to frame Mr. Gaikwad for crimes he did not commit, was intended to cause, or should have known her actions would cause, Mr. Gaikwad to suffer emotional distress.

67. Ms. Hanson's conduct was extreme and outrageous and beyond all bounds of descency.

68. Ms. Hanson's conduct caused Mr. Gaikwad so suffer extreme emotional distress and other losses.

**COUNT II**
**ABUSE OF PROCESS**

69. Mr. Gaikwad repeats and realleges the allegations in each of the foregoing paragraphs as if explicitly stated herein.

70. As described above, Ms. Hanson initiated a judicial process against Mr. Gaikwad in Florida, specifically a restraining order proceeding and a criminal matter.

71. Ms. Hanson misused the judicial process for an ulterior and/or illegitimate purpose.

72. Ms. Hanson willfully misused the judicial process.

73. Mr. Gaikwad suffered actual harm and damage as a result of Ms. Hanson's misuse of the judicial process.

**COUNT III**
**MALICIOUS PROSECUTION**

74. Mr. Gaikwad repeats and realleges the allegations in each of the foregoing

paragraphs as if explicitly stated herein.

75. By and through the actions described above, Ms. Hanson initiated a legal proceeding against Mr. Gaikwad in Florida, specifically a restraining order proceeding and a criminal matter.

76. There was no probable cause or reasonable grounds for the legal processes initiated by Ms. Hanson against Mr. Gaikwad.

77. Ms. Hanson acted with malice in connection with the initiation of the legal processes against Mr. Gaikwad.

78. The legal processes were terminated in Mr. Gaikwad's favor.

79. Mr. Gaikwad suffered actual damages as a result of Ms. Hanson's malicious prosecution.

WHEREFORE, Parikshit Gaikwad demands that judgment be entered in his favor on all counts of his Complaint, including all such accompanying relief as the Court deems appropriate, including but not limited to:

i. after trial, enter judgment on Counts I through III in favor the Plaintiff and against the Defendants and award damages in the amount(s) so assessed by the jury; and
ii. grant such other and further relief as the Court deems just and proper.

**JURY DEMAND**

**MR. GAIKWAD DEMANDS A TRIAL BY JURY ON ALL COUNTS SO TRIABLE**

PARIKSHIT GAIKWAD

By his attorneys,

David H. Rich (BBO No. 634275)
drich@toddweld.com
TODD & WELD LLP
One Federal Street, 27th Floor
Boston, MA 02110
(617) 720-2626

Dated: November 3, 2025

# EXHIBIT A

COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX, SS

MIDDLESEX SUPERIOR COURT
CIVIL ACTION NO. 2381CV03289

PARIKSHIT GAIKWAD

Plaintiff

v.

AMBER HANSON
TRAVIS HANSON

Defendants

**SECOND AMENDED COMPLAINT**
**AND JURY DEMAND**

**INTRODUCTION**

This is a defamation case that stems from the systematic efforts by the Defendant, Amber Hanson ("Ms. Hanson') to ruin the Plaintiff personally and professionally. The Plaintiff and Ms. Hanson had a brief romantic relationship. Since it ended at the Plaintiff's behest, Ms. Hanson has gone to extraordinary lengths to intentionally harm the Plaintiff with defamatory statements. She has published websites, including *www.parigaikwad.com*, in which she makes heinous and false allegations regarding the Plaintiff. She has also created fake Facebook, Instagram and LinkedIn profiles in which she either links to the fake websites she has published or echoes the false claims. And she has reached out to numerous business contacts of the Plaintiff, all in an effort to broadcast her horrifically damaging lies and ruin his professional and personal reputation.

In fact, it is quite easy to demonstrate that Ms. Hanson is lying. An inveterate liar, she has falsely claimed to have worked for Michelle Obama and was friends with both Ms. Obama and

her husband, the former President. When she offered to arrange for a Zoom call between President Obama and the Plaintiff's son, she somehow believed that hiring Reggie Brown, the famous Barack Obama impersonator to appear would fool the Plaintiff, who was watching. It did not.

She also claimed to have worked with Peter Thiel, the billionaire founder of PayPal. To pull off the ruse, she even went so far as to create phony stationery for "Founders Fund," a private equity fund run by Mr. Thiel, on which she created a false job offer for the Plaintiff from Mr. Thiel, as well as multiple non-binding term sheets that purported to show Mr. Thiel's interest in investing in Mr. Gaikwad's start-up. She shared "Peter Thiel's" phone number, from which the Plaintiff received numerous texts about "Mr. Thiel's" interest in the Plaintiff's startup. The list of Ms. Hanson's prevarications goes on, as is described in detail below.

The list includes a torturous tale of lies Ms. Hanson told the Plaintiff about her health, including that the Plaintiff had impregnated her, that she had an abortion, that the abortion was unsuccessful or botched, necessitating a hysterectomy, that during the hysterectomy surgery she suffered seizures and other complications, and that ultimately, she suffered heart and lung failure which left her on death's door. All of this was false.

But the most serious, and damaging, lie Ms. Hanson has told is the one that she is now publishing on the website, *www.parigaikwad.com* and *www.parigaikwad-assault.com*: that the Plaintiff sexually assaulted her. After the Plaintiff filed for a Chapter 209A abuse prevention order in Framingham District Court, Ms. Hanson filed for one of her own in Concord District Court. In it, she alleged that the Plaintiff had sexually assaulted her on September 18, 2022, a claim she repeatedly makes on her fake websites and social media accounts.

Eventually, the Concord District Court held a multi-hour hearing on Ms. Hanson's request for the Chapter 209A Order, after which it summarily dismissed her claims. Likely, Ms. Hanson's

numerous fabrications and falsehoods influenced the court's decision. It is also likely that a text sent by Ms. Hanson to the Plaintiff later in the day on September 18, 2022, the day that the alleged sexual assault took place influenced the Court as well. It stated:

"And before I forget the sex was great today." (*See* Exhibit 1).

Ms. Hanson may be mentally ill, malevolent, or a combination of the two. It doesn't matter. She needs to be stopped and held accountable for her unlawful acts. She will likely continue to harass Mr. Gaikwad and inflict further harm if she is not stopped.

Her husband, the Defendant, Travis Hanson ("Mr. Hanson") has compounded his wife's misdeeds by amplifying and republishing her defamatory statements. He is thus also liable to the Plaintiff.

**PARTIES**

1. The Plaintiff, Parikshit Gaikwad ("Mr. Gaikwad") is in an individual residing in Holliston, Middlesex County, MA.
2. The Defendant, Amber Hanson ("Ms. Hanson") is an individual residing in Riverview, Florida.
3. The Defendant, Travis Hanson ("Mr. Hanson") is an individual residing in Riverview Florida.

**JURISDICTION AND VENUE**

4. The Court has jurisdiction over Defendant and the claims set forth herein pursuant to Mass. G.L. c. 231A § 1, *et. seq.* and Mass. G.L. c. 212 § 3 as, at the times the Defendants commited the torts in question, they resided in Massachusetts and committed the torts in Massachusetts.

5. Middlesex County is the proper venue as the Plaintiff resides in this county..

## FACTS

### *Mr. Gaikwad and Ms. Hanson Begin Dating*

6. Mr. Gaikwad holds a Bachelor of Engineering Degree from the University of Pune (India), a Master of Science Degree in Electrical Engineering from Mississippi State University, and a Master of Business Administration Degree from the University of New Orleans.

7. Mr. Gaikwad has had a 20-plus year successful corporate career in product development, product management & strategy for $50M+ projects/portfolios in building device connectivity, digital health and data science solutions.

8. In April 2022, Mr. Gaikwad, who is divorced with one son, met Ms. Hanson on a dating app. They met for the first time on April 21, 2022, and she told him she was divorced (the first known lie, as it turns out, since she is actually still married to a man in the Air Force, who lives at Hanscomb Air Force Base).

9. Mr. Gaikwad and Ms. Hanson began dating. They texted often and, initially, saw each other once or twice a week during the spring, a busy travel time for Mr. Gaikwad, who had a number of work commitments abroad.

10. They both discussed their backgrounds, with Ms. Hanson telling Mr. Gaikwad that she was from California, held a degree in Psychology from Northern Arizona University, and had worked both in the U.S. and abroad in a series of public policy positions.

11. Among other things, Ms. Hanson told Mr. Gaikwad that she was working as the Associate Director of Foreign Policy as a part of a 20-people team for Michelle Obama's nascent 2024 Presidential Campaign.

12. Mr. Gaikwad shared that he was working to put together a start-up company, focused on a technology platform for use in connection with pharmaceutical clinical trials. Ms.

Hanson seemed intrigued, and she make numerous references to her connections with high-net worth individuals who might be interested in investing in Mr. Gaikwad's start-up. Unfortunately, Ms. Hanson began casting a web of what turned out to be lies.

***Ms. Hanson's Claims Regarding Her Health***

13. As Ms. Gaikwad and Ms. Hanson grew closer, Ms. Hanson interjected a prolonged turbulence into their relationship by fabricating of a series of supposedly catastrophic health crises. Beginning in June, this included false claims of pregnancy, ER visits, abortions, a hysterectomy and other surgeries, serious medical conditions, organ failures, multiple resuscitations, and dire predictions, culminating in Ms. Hanson's purported near death on September 15, 2022. Most of these medical "events" occurred while Mr. Gaikwad was traveling, which he often did for business, both domestically and abroad.

14. Among other things, in July 2013, Ms. Hanson claimed to be pregnant. On July 13, 2022, she had Mr. Gaikwad drive her to Lahey Clinic so that she could undergo an abortion. However, she refused to allow him to come into the hospital with her. Two days later, she informed him that the purported abortion "didn't work" and, approximately ten days later, she had to undergo a hysterectomy. It appears none of this was true and that Ms. Hanson was simply fabricating these medical events.

15. For example, on one occasion, Ms. Hanson asked the Mr. Gaikwad to pick her up from Lahey Clinic after allegedly spending the night there for a purported health emergency. When Mr. Gaikwad went to the ER, the desk staff indicated that no person with Ms. Hanson's name and date of birth was admitted. The staff also checked the Hospital System (another building) and stated that there was no person with Ms. Hanson's name in that system either. When Mr. Gaikwad drove to the main hospital building, Ms.

Hanson was outside waiting for him

16. On yet another occasion, Ms. Hanson asked Mr. Gaikwad to accompany her to her appointment for gastrointenstinal issues. After the appointment, she said that a counselor named Allison checked her for mental health issues. She mentioned that the counselor asked someone to accompany her 24/7 for the next few days. Mr. Gaikwad wanted to get more information so he asked the employee at the front desk if they could speak with Allison again. The front desk staff informed Mr. Gaikwad that no one named Allison worked there

17. Mr. Gaikwad does not pretend to be able to divine Ms. Hanson's motivation in fabricating a false pregnancy, followed by a cascade of medical emergencies. He does know, however, that Ms. Hanson always requested him to take her on medical appointments but instructed the staff to escort him out or not let him in to the clinic or ER room and never showed any signs of having undergone significant medical procedures.

18. He also knows that even while in the midst of what would have been traumatizing medical events, had they been real, Ms. Hanson maintained and developed a string of other complicated lies.

***The Wedding that Wasn't, Peter Thiel, A Job Offer, and an Encounter with an Obama Impersonator***

19. On August 16, 2022, Ms. Hanson reported to Mr. Gaikwad that she was experiencing heart and lung failure and had no chance of survival. This ruse went to the extent that while Mr. Gaikwad was at Amsterdam airport during a layover, Ms. Hanson wanted to take the opportunity to say her proverbial "goodbye." Despite this, she was shortly thereafter "discharged" from the hospital. And she quickly turned her attention to an upcoming wedding on Martha's Vineyard to which she and Mr. Gaikwad had

supposedly been invited.

20. The reason for her apparent excitement, according to Ms. Hanson, was that Bill and Hilary Clinton, George and Laura Bush, as well as Barack and Michelle Obama, were all going to be attending the nuptials, which was to take place on September 10, 2022.

21. But the day before the wedding on Sep 8, 2022, Ms. Hanson informed Mr. Gaikwad that her father passed away. Still, she insisted on going to Cape Cod instead of the wedding on Martha's Vineyard, so that in case, according to her, she changed her mind and wanted to attend, they would be close to the venue.

22. Ms. Hanson told Mr. Gaikwad her mother passed away on September 11, 2022.

23. A day later, another health "crisis" followed. On September 12, 2022 Ms. Hanson was allegedly found unresponsive in her apartment and taken to Lahey Clinic by ambulance. A woman Ms. Hanson identified as her aunt texted Mr. Gaikwad to inform him that Ms. Hanson was experiencing multiple organ failures and had to undergo kidney dialysis.

24. By September 13, 2022, Ms. Hanson had "worsened" and over the next two days she or her aunt reported on multiple occasions that she was near death, including reporting that she was discharged home to die in peace, then readmitted when she was again found not breathing.

25. Prior to her purported near death, Ms. Hanson arranged for Mr. Gaikwad to speak with "Peter Thiel," with whom she had allegedly worked on projects in Africa. Ms. Hanson arranged for "Mr. Thiel" to participate in a Zoom call for the purpose of hearing Mr. Gaikwad's investment pitch regarding his start-up.

26. "Peter Thiel" didn't turn on his video camera during this September 15, 2022 Zoom call, but did listen to Mr. Gaikwad's description of the investment opportunity before

ending the call, without making any investment commitment.

27. Despite her near-death experience the week before, on September 18, 2022, Ms. Hanson now was somehow back to normal. She asked Mr. Gaikwad to take her for a house showing followed by coffee and lunch.

28. That day, Ms. Hanson insisted on having sex, despite the legion of medical procedures she purportedly had undergone in the past two months. Mr. Gaikwad saw no evidence of any surgeries.

29. Later that day, Ms. Hanson sent Mr. Gaikwad the below text.




30. This text, and the other screenshots of texts included in this Second Amended

Complaint, must be considered when weighing the veracity of Ms. Hanson's claims, including on the website www.parigaikwad.com, that Mr. Gaikwad sexually assaulted her on the very date that she gushed "the sex was great today."

31. Ms. Hanson next scheduled a dinner meeting with "Peter Thiel," for September 20, 2022 at a restaurant in Boston.

32. Mr. Gaikwad picked up Ms. Hanson in Framingham to take her to the dinner meeting at which time, as the text below reveals, she was eager to have him meet her daughter, Bria.




33. Two days after Mr. Gaikwad allegedly sexually assaulted her, Ms. Hanson introduced

him to her teenage daughter.

34. Of course, Mr. Thiel never showed up for the dinner meeting.

35. That didn't slow Ms. Hanson down. Over the next several weeks, Ms. Hanson claimed to be arranging a substantial investment from Mr. Thiel in Mr. Gaikwad's start up, going so far as to generate multiple fraudulent term sheets for the investment, and even a job offer on supposed letterhead of Mr. Thiel's private equity fund, Founders Fund.

36. These fraudulent term sheets and fake job offer were sent by a fictitious attorney named Judith Weizenberg, who was purportedly representing Mr. Thiel.

37. Of note, "Attorney Weizenberg's" first communications were from a gmail account, allegedly because of a problem with her office email.

**From:** Judith Weizenberg judithweizenberg@gmail.com
**Subject:** Confidential
**Date:** September 17, 2022 at 1:11 PM
**To:** Pari.gaikwad@gmail.com
**Cc:** Amberhansonuk@icloud.com

Hi Pari:

I am having issues with my email currently. Peter asked me to send this through my personal email instead.

Attached is the agreement and a photo of the email I sent earlier this morning.

My apologies sending it through this medium. Once the issue is resolved will send it through my work email. Wanted to ensure you were aware. Please communicate through my official email address.

Best,

Judith

Recet .pdf

38. Later, when the problem was "fixed" the emails would come from judith@weizenberglaw.com, a domain registered anonymously on September 17, 2022

39. While it would have been beneficial for Mr. Gaikwad if the clarity of hindsight had appeared sooner, by this time he was increasingly wary of Ms. Hanson. This is unsurprising, given the avalanche of turmoil and lies she had injected into his life.

40. She seemingly felt otherwise. Ms. Hanson invited herself to Mr. Gaikwad's house on

Sep 21 and Sep 23 and insisted on having sex. Mr. Gaikwad was sick with flu and didn't even go close to her despite her various attempts to get physical.

41. Ms. Hanson continued to express strong feelings for Mr. Gaikwad, as the below text of September 24, 2022 reveals:




42. Finally, on September 25, 2022, Ms. Hanson staged an apparent Zoom call with President Obama that she arranged for Mr. Gaikwad's son. However, instead of the former President, a well-known impersonator, Reggie Brown, appeared playing the role of Mr. Obama. Mr. Gaikwad was not fooled.

43. On September 26, 2022, Mr. Gaikwad knew he had had enough and informed Ms. Hanson that he was ending the relationship. Needless to say, it did not go smoothly.

*The Aftermath of the Breakup*

44. Despite the fact that she claimed to have undergone a hysterectomy in July, on September 28, 2022, two days after Mr. Gaikwad ended the relationship, Ms. Hanson again claimed that she was pregnant. Mr. Gaikwad was surprised by this information, wary of Ms. Hanson, but he was also cognizant of the fact that the best thing he could do in the circumstances was to try and be supportive.

45. Ms. Hanson broke the news about her "pregnancy" while she was allegedly in the United Kingdom. What followed were several days of frantic text communications from Ms. Hanson, as well as her daughter, about another medical emergency, this one supposedly severe enough to keep her from flying back to the States for a time.

46. When she did return, the turmoil continued, as Ms. Hanson oscillated between aborting the "pregnancy," or delivering to term. Among other things, she asked Mr. Gaikwad to accompany her to an ultrasound appointment at her OB/GYN's office. However, when they got to the doctor's office, she told him he was not allowed to go in and asked him to leave.

47. Her behavior became more erratic and frantic as September turned to October and Mr. Gaikwad became struck by, and concerned about, the menacing tone in Ms. Hanson's communications.

48. As a result of her behavior, Mr. Gaikwad became more concerned about his and his son's safety, Mr. Gaikwad went to Holliston Police Department on October 7 2022, to file a complaint about Ms. Hanson.

49. Among other things, she began threatening to drive to Mr. Gaikwad's house and take him to court. She told him that she didn't care if he called the police.

50. Thereafter, on October 10, 2022, Ms. Hanson showed up at the Holliston Police Department at approximately 1 pm wearing pajamas to complain about Mr. Gaikwad.

She was explicitly told by Holliston PD not to go to Mr. Gaikwad's house. But of course, that is exactly what Ms. Hanson did immediately upon leaving the police station. Mr. Gaikwad called the police and when they arrived, he asked them to escort her off the property.

51. On October 11, 2022, Mr. Gaikwad learned that Ms. Hanson had found his father's LinkedIn profile and was messaging him on that platform, as well as reaching out to him via email.

52. On the same day she also messaged on the startup group chat informing everyone in the company that she was pregnant, which was a lie. Additionally, she messaged and called Mr. Gaikwad's ex-wife with a similar false message.

53. That same day, Mr. Gaikwad filed an application for a 209A Abuse Prevention Order in the Framingham District Court.

54. The next day, Ms. Hanson filed her own application for a 209A Abuse Prevention Order, this time in Concord District Court. She did not mention being pregnant, but she asserted that Mr. Gaikwad had sexually assaulted her on September 18, 2022.

55. Following a multi-hour evidentiary request on Ms. Hanson's application, the Court dismissed the matter.

*Internet Defamation*

56. Mr. Gaikwad recently discovered that Ms. Hanson was publishing multiple websites that include heinous defamation, including www.parigaikwad.com, whose landing page is the following:




57. The first site listed following a google search of the words "Pari Gaikwad Holliston" is the following:




58. This search result in not an accident. Ms. Hanson hired a business whose website is www.seoresultspro.com to set up the parigaikwad.com website and to increase its visibility on google in order to cause harm to Mr. Gaikwad.

59. Mr. Gaikwad knows this to be true because individuals, presumably employees, affiliated with secoresultspro.com gave a presentation in which they bragged about their ability to perform "reverse" reputation management, i.e., publish negative information about individuals which gets highlighted in google searches. They specifically bragged about setting up a website for a client who had been sexually assaulted by Mr. Gaikwad.

60. In the course of their self-congratulatory presentation, the individuals from seoresultspro.com revealed the following information about the website they created and the client who hired them:






61. Amberhansonuk@icloud is the email address Ms. Hanson used to communicate by email with Mr. Gaikwad. 937-260-9140 is her phone number. The screenshots reveal that she paid $1,000 in an effort to ruin Mr. Gaikwad's life. They also demonstrates that this was clearly a well-planned strategy and plan directed to intentionally harm Mr. Gaikwad's reputation which includes creating a number social media assets and reels.

62. Ms. Hanson has not stopped with this website. She has published a blog on Medium.com under the pseudonym Alison Summer entitled "The Day My Life Changed Forever" (https://medium.com/@alisonsummer282/the-day-my-life-changed-forever-0a930325f7bd) in which she reiterates her defamatory claim that Mr. Gaikwad sexually assaulted her.

63. She has published Facebook pages in Mr. Gaikwad's name in which she links to the

website:




64. She has published fake LinkedIn Profiles, including under the name Katherine Quigley, in which she links to the parigaikwad.com website. Ms. Hanson, under the fake profile of Katherine Quigley, started sending connection requests to Mr. Gaikwad's professional connections on LinkedIn with a message asking them to visit the website.




65. Ms. Hanson also posted an article on her own LinkedIn page with a link to the website




66. This post was also reposted by her husband, Mr. Hanson, on his own LinkedIn profile.




67. Mr. Hanson's reposting of his wife's post constitutes a republishing of the defamatory statements as if they were his own.

68. Ms. Hanson also created a Facebook page wherein she accidently included her own email address, which was later removed.







69. Among other maliciously false statements, Ms. Hanson has published the following:

> "I now know that it is very possible that other women have been sexually assaulted by Pari Gaikwad from Holliston, MA. "

70. She has also maliciously and falsely published the following showing an intentional disregard for the truth:

> "On September 18, 2022 my life changed forever. I was raped by Pari Gaikwad. He has denied that he raped me, but said that it was consensual since we had been in a romantic relationship. Not only did this event happen, but afterwards he continued to violate me. I have realized that this relationship was a cycle of interpersonal violence. He showed up at doctor's appointments, tried to and I believe was successful in logging

into my electronic healthcare records, and tried to convince me to transfer financial funds to him based upon fraud."

71. Ms. Hanson also chose to publish defamatory statements about Mr. Gaikwad's professional life, including on a blog she started on Medium.com, in which she falsely asserted he had been terminated from his employment for assaulting a fellow employee.

Medium
https://medium.com › pari-gaikwad...

Pari Gaikwad Resignation - Unknown

14 hours ago — In August 2022, Pari Gaikwad had to resign from his employer due to the fact that he assaulted another employee. Pari Gaikwad resigned ...

In August 2022, Pari Gaikwad had to resign from his employer due to the fact that he assaulted another employee. He resigned before he was to terminated. In court another person he assaulted had to see the report the company produced on this.

Individuals like him believe that he can escape responsibly, but the truth is that many people can escape responsibility for what occurs in the work place. The Harvey Weinstein case is an example of someone that went unchecked for years as women were scared to come forward for repercussions.

Also when a victim comes forward every action they have done in their life comes under scrutiny. That is scary to think about it as we all have things that could be turned into a negative light.

Accountability for perpetrators and support for victims are key.

72. The statements in the Medium blog identified in Paragraph 69 are false and defamatory and have harmed Mr. Gaikwad personally and professionally.

73. Each of these instances identified in this Complaint, as well as numerous other incidents in which Ms. Hanson published defamatory statements about Mr. Gaikwad on social media, were read in Massachusetts and were made with the malicious intent of intentionally harming Mr. Gaikwad by publishing false statements that have caused him significant harm personally and professionally. Ms. Hanson used multiple

distribution channels, including two websites, two blogs, other blogs with links to the websites, a Facebook page, Facebook account, Instagram account, fake LinkedIn account, a LinkedIn company page, a LinkedIn post on her own account as part of her malicious effort to defame and intentionally harm Mr. Gaikwad's personal and professional reputation.

**COUNT I**
**DEFAMATION**
**Gaikwad v. Ms. Hanson**

74. Mr. Gaikwad repeats and realleges the allegations in each of the foregoing paragraphs as if explicitly stated herein.

75. Ms. Hanson published false statements of fact about Mr. Gaikwad which are capable of damaging his reputation in the community and the false statements also constitute Defamation per se.

76. The false statements charged Mr. Gaikwad with conduct which tends to injure him in his trade, business, or profession and have caused him to suffer loss, including economic loss and emotional distress.

77. As a result, Ms. Hanson has defamed Mr. Gaikwad and is liable to him for damages.

**COUNT II**
**INJUNCTIVE RELIEF**
**Gaikwad v. Ms. Hanson**

78. Mr. Gaikwad repeats and realleges the allegations in each of the foregoing paragraphs as if explicitly stated herein.

79. The defamatory social media posts, websites and accounts published by Ms. Hanson constitute defamation per se.

80. It is imperative that all of the defamatory posts, websites and accounts, which have caused substantial harm to Mr. Gaikwad, be deleted and that Ms. Hanson be enjoined

from publishing them again. They are not protected speech and such an injunction will cause no harm to Ms. Hanson.

**COUNT III**
**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**
**Gaikwad v. Ms. Hanson**

81. Mr. Gaikwad repeats and realleges the allegations in each of the foregoing paragraphs as if explicitly stated herein.

82. Hanson intended to cause, or should have known her actions would cause, Gaikwad to suffer emotional distress.

83. Hanson's conduct was extreme and outrageous.

84. Hanson's conduct caused Gaikwad so suffer extreme distress.

**COUNT IV**
**NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**
**Gaikwad v. Ms. Hanson**

85. Mr. Gaikwad repeats and realleges the allegations in each of the foregoing paragraphs as if explicitly stated herein.

86. Ms. Hanson acted negligently in making her false statements about Mr. Gaikwad and in her other actions described herein and as in fact occurred.

87. Mr. Gaikwad suffered emotional distress caused by Ms. Hanson's actions and published statements.

88. Mr. Gaikwad has suffered physical harm with objective symptomatology.

89. More specifically, Mr. Gaikwad has suffered the following symptoms: Near daily cluster/tension headaches, concentration issues on a near daily basis, severe anxiety, persistent depression, insomnia and disturbed sleep, untimed sleeping during the day, body shakes, frequent migraine headaches, feelings of despair, helplessness and lack of motivation, nightmares, persistent fatigue, excessive worrying, intrusive memories,

frequent flashbacks, instances where Mr. Gaikwad is easily frightened and/or startled, shortness of breath and loss of appetite, among others. Mr. Gaikwad has been treated by mental health counselors as a result of the distress caused by the Defendants. In addition, Mr. Gaikwad has been prescribed anti-anxiety medication to treat the above symptons.

90. A reasonable person would have suffered emotional distress under the circumstances described herein and as in fact occurred.

**COUNT V**
**DEFAMATION**
**Gaikwad v. Mr. Hanson**

91. Mr. Gaikwad repeats and realleges the allegations in each of the foregoing paragraphs as if explicitly stated herein.
92. Mr. Hanson republished faslse statements of fact about Mr. Gaikwad which are capable of damaging Mr. Gaikwad's reputation in the community.
93. The false statements charge Mr. Gaikwad with conduct which tends to injure him in his trade, profession or business.
94. As a result, Mr. Hanson has defamed Mr. Gaikwad and is liable to him for damages.

**PRAYERS FOR RELIEF**

WHEREFORE, Mr. Gaikwad prays that the Court enter the following relief:

1. Judgment in his favor in the full amount of his damages, plus statutory interest and costs.
2. Injunctive relief as requested herein.
3. Such other relief as this court deems just and proper.

**JURY DEMAND**

**MR. GAIKWAD DEMANDS A TRIAL BY JURY ON ALL COUNTS SO TRIABLE**

PARIKSHIT GAIKWAD

By Its Attorneys,

David H. Rich (BBO No. 634275)
drich@toddweld.com
TODD & WELD LLP
One Federal Street, 27th Floor
Boston, MA 02110
(617) 720-2626

Dated: June 26, 2024

**CERTIFICATE OF SERVICE**

I, David H. Rich, hereby certify that on this 26th day of June, 2024 the foregoing was served via email upon Plaintiff's counsel of record to this matter:

Tara J. Davis, Esq.
Nesenoff & Miltenberg,LLP
101 Federal Street, 19th Floor
Boston, MA 02110
tdavis@nmllplaw.com

David H. Rich

# EXHIBIT 1


7:14
AH
Amber
Quick question what do we do about fog?
Let me think of a plan
I'll share tomorrow
Don't worry
Just sleep
Super anxious about that one
We will figure it out
I have a rough plan
And before I forget the sex was great today
Yes! It always is.
Mon, Sep 19, 7:23 AM
Morning
iMessage
Cash

# EXHIBIT B

IN THE CIRCUIT COURT OF THE THIRTEENTH JUDICIAL CIRCUIT
*EN LA CORTE DEL CIRCUITO DEL DECIMOTERCER CIRCUITO JUDICIAL*
HILLSBOROUGH COUNTY, FLORIDA
*ESTADO DE FLORIDA, EN Y PARA EL CONDADO DE HILLSBOROUGH*
CIRCUIT CRIMINAL DIVISION
*DIVISIÓN CRIMINAL DE LA CORTE DEL CIRCUITO*

STATE OF FLORIDA
*ESTADO DE FLORIDA*

CASE NO: 2025 CF 001369
*NO. DE CASO:*

v.

DIVISION: B
*DIVISIÓN:*

Amber Hanson /

FILED
AUG 13 2025
CLERK OF CIRCUIT COURT

DEFENDANT'S DATE OF BIRTH 12-10-81

**UNIFORM PLEA, ACKNOWLEDGMENT AND WAIVER OF RIGHTS FORM**
***FORMULARIO UNIFORME DE DECLARACIÓN, RECONOCIMIENTO Y RENUNCIA DE DERECHOS***

| CHARGE(S) *CARGO(S)* | MANDATORY MINIMUM *PENA MÍNIMA OBLIGATORIA* | MAXIMUM PENALTY *PENA MÁXIMA* |
|---|---|---|
| ① Unlawful Use 2way Comm. Device 1ct | 3°F | 5 FSP |
| ② Perjury (Official Proceeding) 1ct | 3°F | 5 FSP |
| ③ Fabricate Evidence 1ct | 3°F | 5 FSP |
| ④⑤ False Report Crime 2 cts | 1° M | 364 HCJ |
| ~~False Info~~ | ~~1° M~~ | ~~364 HCJ~~ |
| ⑥ Harassment 817.568 1 ct | 1° M | 364 HCJ. |
| ⑦ Obstruction 1 ct. | 1° M | " |

For ~~sections 1 and 2, check either~~ "a" or "b." *Para la sección 1 y 2, marque "a" o "b."*

☒ 1(a) I am pleading guilty, and acknowledge (my guilt)(I feel it is in my best interest to do so).
*Me declaro culpable y reconozco (mi culpabilidad) (pienso que es lo que más me conviene hacer).*

OR / *O*

☐ 1(b) I am pleading nolo contendere, and acknowledge I feel it is in my best interest to do so.
*Me declaro no me opongo, y reconozco que es lo que más me conviene hacer.*

---

☒ 2(a) I am pleading open to the Court and understand there is no agreement as to what sentence I will receive, and the Court can sentence me within its discretion.
*Me declaro abiertamente ante el juez y entiendo que no existe ningún acuerdo relacionado con la sentencia que voy a recibir y que el juez puede sentenciarme a su discreción.*

OR / *O*

☐ 2(b) I am pleading pursuant to a plea agreement and the terms of that agreement are as follows:
*Me declaro conforme a un acuerdo de declaración y los términos son los siguientes:*

FSP ________ *Prisión Estatal de Florida*

Psychological evaluation and treatment if necessary ________ *Evaluación psicológica y tratamiento (de ser necesario)*

County Jail ________ *Cárcel del Condado*

Probation ________ *Probatoria*

Specified Residency ________ *Residencia Especificada*

Community Control ________ *Reclusión Domiciliaria*

Community Control II ______________________
*Reclusión domiciliaria II*

Restitution to: ________________ in the amount of: ________ to be paid monthly @ ________
*Restitución a:* *por la cantidad de:* *para pagarse mensualmente a*

Drug/Alcohol Evaluation (within 30 days) and treatment if necessary (counseling/urine screens)__________
*Evaluación de Alcohol/ Drogas (dentro de 30 días) y tratamiento de ser necesario (con un consejero/ exámenes de orina)*

Community Service ____________________ Driver's License Revocation____________
*Servicio Comunitario* *Revocación de Licencia de Conducir*
at __________ hours per month GED ________________
*a* *horas por mes* *GED*

Other ______________________________________________________________
*Otros*

3. I understand if probation or community control is part of the plea agreement the Court may impose any special conditions it believes it should, but such special conditions will be orally pronounced by the Court at the time of sentencing. I understand the Court may require me to pay up to $1 per month to "First Step of Hillsborough, Inc." as a special condition of probation or community control pursuant to section 948.039, Florida Statutes.
*Entiendo que si la probatoria o la reclusión domiciliaria forman parte del acuerdo declaratorio, la corte podria imponer cualesquiera condiciones especiales que crea deba imponer, pero dichas condiciones especiales se pronunciarán oralmente por el juez en el momento de la sentencia. Entiendo que la corte me requerirá pagar hasta $ 1 por mes para "First Step of Hillsborough, Inc." como una condición especial de probatoria o reclusión domiciliaria de acuerdo a la sección 948.039, Estatutos de la Florida.*

4. I understand I have a right to plead not guilty and the right to be tried by a jury to determine whether I am guilty or not guilty. I understand I have the right to be represented by an attorney at the trial and if I cannot afford one, the Court will appoint an attorney to represent me. I understand I have the right to compel the attendance of witnesses on my behalf, the right to confront and cross examine all witnesses testifying against me, and the right not to testify or be compelled to incriminate myself. I understand if I plead guilty or nolo contendere, there will be no trial and I waive all the rights that go along with a trial.
*Entiendo que tengo el derecho de declararme no culpable y el derecho de ser juzgado por un jurado que decidiría si soy culpable o no. Entiendo que tengo el derecho de ser representado por un abogado para el juicio y que si no tengo los medios para contratar a uno, la corte nombrará un abogado para que me represente. Entiendo que tengo el derecho de obligar la comparecencia de testigos para que declaren a mi favor, el derecho de repreguntar a todos los testigos de cargo y el derecho de no testificar o de ser obligado a incriminarme. Entiendo que si me declaro culpable o no me opongo, no habrá juicio y renuncio a todos los derechos propios de un juicio.*

5. I understand if I plead guilty or nolo contendere without reserving the right to appeal, I am waiving my rights to appeal all matters relating to the judgment including the issue of my guilt or innocence, but not impairing my right to review by appropriate collateral attack. I understand if I wish to take an appeal and cannot afford an attorney to help me in my appeal, the Court will appoint an attorney to represent me for that purpose.
*Entiendo que si me declaro culpable o no me opongo sin reservarme el derecho a apelar, estoy renunciando a mis derechos de apelación sobre todos los elementos relacionados con la sentencia incluyendo el asunto de mi culpabilidad o inocencia, pero sin perjudicar mi derecho a reexaminar por medio de una refutación indirecta apropiada. Entiendo que si deseo apelar y no puedo contratar un abogado para ayudarme con mi apelación, la Corte asignará un abogado para representarme para ese propósito.*

6. I understand there are facts the State could use to prove the charge(s) against me.
*Entiendo que existen hechos que el Estado podría usar para probar el o los cargos en mi contra.*

7. I understand if I plead guilty or nolo contendere the judge may ask me questions about the charge(s) to which I have just pled and if I am untruthful, my answer(s) may later be used against me in a prosecution for perjury.
*Entiendo que si me declaro culpable o no me opongo, el juez podría hacerme preguntas respecto al cargo al cual me acabo de declarar y que si falto a la verdad, mis respuestas podrían ser usadas en mi contra en un proceso por perjurio.*

8. I understand that if I am not a citizen of the United States and I plead guilty or nolo contendere and the Court accepts my plea, regardless of whether adjudication of guilt is withheld, my plea and the Court's acceptance of my plea may have the additional consequence of changing my immigration status, including DEPORTATION or REMOVAL from the United States. I understand that I should consult with my attorney if I need additional information concerning potential immigration consequences of my plea. I understand that if I have not discussed the potential immigration

consequences with my attorney, the Court will, upon my request, allow a reasonable amount of time for me to consider the appropriateness of my plea in light of the advisement in this section.
*Entiendo que si no soy un ciudadano de los Estados Unidos y me he declarado culpable o no me opongo y la corte acepta mi declaración, ya sea que se haya retenido o nó la adjudicación de culpabilidad, mi declaración y la aceptación por la corte puede tener la consecuencia adicional de cambiar mi situación de inmigración, incluyendo DEPORTACIÓN o remoción de los Estados Unidos, exclusión de la readmisión a los Estados Unidos, detención, negación de la naturalización, o inelegibilidad para la ciudadanía de acuerdo con las leyes de los Estados Unidos. Entiendo que debo consultar con mi abogado si necesito información adicional concerniente a las posibles consecuencias sobre inmigración de mi declaración. Entiendo que si no he discutido con mi abogado sobre las posibles consecuencias sobre inmigración, la corte concederá, a mi pedido, un período de tiempo razonable para considerar apropiadamente mi declaración teniendo en cuenta la información contenida en esta sección.*

9. I understand this plea could result in my driver's license being suspended or revoked if the charge(s) to which I am pleading is one where automatic, mandatory suspension or revocation is required by law.
*Entiendo que esta declaración podría resultar en la suspensión o revocación de mi licencia de conducir si el cargo al cual me estoy declarando es un delito donde se requiere la suspensión o revocación automática obligatoria por la ley.*

10. I understand if I plead guilty or nolo contendere to a sexually violent offense or a sexually motivated offense, or if I have been previously convicted of such an offense, the plea may subject me to involuntary civil commitment as a sexually violent predator upon completion of any prison sentence or jail sentence on this or any other case.
*Entiendo que si me declaro culpable o no me opongo a un delito sexual con violencia, o a un delito motivado sexualmente, o si previamente he sido condenado por dicho delito, esta declaración me sujetaría a un confinamiento involuntario civil como un depredador sexual violento una vez que haya concluido cualquier sentencia de prisión o cárcel en este o cualquier otro caso.*

11. I understand if I plead guilty or nolo contendere to a qualifying sexual offense, or if I have been previously convicted of such an offense or if I have been designated a sexual predator, I will be subject to mandatory electronic monitoring pursuant to section 948.30(3), Florida Statutes.
*Entiendo que si me declaro culpable o no me opongo a un delito de categoría sexual, o si he sido condenado previamente por dicho delito, o se me ha catalogado como depredador sexual, estaré sujeto a un control electrónico obligatorio conforme a la sección 948.30 (3), de los Estatutos de la Florida.*

12. I understand my pleading guilty or nolo contendere will result in the Court imposing MANDATORY statutory costs. I also understand my plea may result in the Court imposing certain other costs and attorney's fees and I do not object to the imposition or amount of such costs and fees and I waive my right to a hearing on the imposition and amount of such costs and fees. I have had an opportunity to review with my attorney the mandatory costs (including fines and surcharges) that MUST be assessed against me and discretionary costs (including fines and surcharges) that MAY be assessed against me. I understand if I fail to pay the imposed costs and fees my driver's license may be suspended.
*Entiendo que si me declaro culpable o no me opongo traerá como resultado que el juez imponga las costas OBLIGATORIAS de ley. Asimismo, entiendo que mi declaración podría hacer que el juez imponga ciertos costos y honorarios del abogado. No me opongo a la imposición o la cantidad de costos y honorarios y renuncio a mi derecho a una audiencia respecto a la imposición y la cantidad de costos y honorarios. He tenido la oportunidad de revisar con mi abogado la lista adjunta de costas obligatorias (multas y recargos) que me TIENEN que ser impuestos y las costa opcionales (incluyendo multas y recargos) que me puedan imponer. Entiendo que si no pago los costos y honorarios impuestos, mi licencia de conducir podría ser suspendida.*

13. I understand a conviction for an offense to which I am pleading guilty or nolo contendere may serve to enhance the sentence for any offense for which I may be convicted of in the future.
*Entiendo que una condena por un delito al cual me estoy declarando culpable o no me opongo podría servir para aumentar la sentencia por cualquier delito por el cual se me podría condenar en el futuro.*

14. I am not under the influence of drugs, an alcoholic beverage or medication, but I am taking this medication: prazosin, Lexapro, hydroxyzine, clonidine, trileptal, synthroid
*No me encuentro bajo los efectos de drogas ni bebidas alcohólicas, aunque estoy tomando este medicamento:*

15. I do not have any mental illness that would keep me from understanding this plea and its consequences.
*No padezco de ninguna enfermedad mental que podría impedirme entender esta declaración y sus consecuencias.*

16. I certify that no one has threatened or coerced me in any way in order to get me to enter this plea, and I am pleading freely and voluntarily. Other than the terms of the plea negotiation as set forth above (if applicable), no one has promised me anything upon which I have relied in order to influence me to enter this plea.
*Certifico que nadie me ha amenazado ni coaccionado de ninguna manera para que yo asiente esta declaración y me declaro libre y voluntariamente. Aparte del acuerdo declaratorio, como se estipula en el párrafo antes mencionado (si es aplicable), nadie me ha prometido nada en lo cual yo me he basado con el motivo de influenciarme para que yo asiente esta declaración.*

17. I certify that I have discussed the charges with my attorney including the maximum possible and mandatory minimum (if any) penalties and possible defenses and am fully satisfied with the representation of my attorney. I understand by entering this plea there is no guarantee what gain time, if any, the Department of Corrections or any county jail may award me.
*Certifico que he revisado los cargos con mi abogado, incluso las penas máximas posibles y mínimas obligatorias (si las hubiera) y defensas posibles y estoy completamente satisfecho con la representación de mi abogado. Entiendo que al asentar esta declaración no hay garantía del tiempo ganado, de haberlo, que el Departamento de Corrección o cualquier cárcel del condado podrán conceder me.*

18. I have reviewed my criminal punishment code scoresheet and it is correct.
*He revisado mi hoja de puntuación y está correcta.*

19. I have reviewed the standard terms of supervision and I understand I must follow them as well as any special conditions the Court thinks are appropriate.
*He revisado las condiciones generales de supervisión y entiendo que debo cumplirlas, así como cualesquiera otras condiciones que la corte considere apropiadas.*

20. I understand no one, including my attorney, can accurately predict the actual time I will serve on a sentence and I may be required to serve the entire sentence.
*Entiendo que nadie, incluyendo mi abogado, puede predecir con certeza el tiempo real que cumpliré por una sentencia y que podría requerirse que cumpla la sentencia completa.*

21. I certify that there are not any other witnesses I want my attorney to investigate or call, nor is there any other type of discovery or investigation I want my attorney to do, or any other motions I want my attorney to file and set for hearing prior to entering this plea.
*Certifico que no hay otros testigos que quiero que mi abogado investigue o llame, ni tampoco existe otro tipo de prueba o investigación que quiero que mi abogado haga, o algunas otra peticiones que quiero que mi abogado presente y fije para una audiencia antes de asentar esta declaración.*

22. I certify that no one, including my attorney, has made any promises concerning the jail credit or prison credit I am to receive other than the fact that I am going to receive credit for every day I actually spent incarcerated on this case, which is ___________ days.
*Certifico que nadie, incluyendo mi abogado (a) me ha hecho ninguna promesa respecto al tiempo que será acreditado de la cárcel o prisión además del hecho que voy a recibir crédito por cada día que realmente pasé encarcelado en este caso, cual son ____________ días.*

[signature] 8-13-25

Defendant / *Acusado* Date / *Fecha*

**STATEMENT OF ATTORNEY**
*DECLARACIÓN DEL LICENCIADO*

I have reviewed this plea form and the mandatory costs with my client, the Defendant in this case, and it is my belief the Defendant fully understands its contents.
*Yo he revisado este convenio declaratorio y los costos obligatorios con mi cliente, el Acusado en este caso, y en mi opinión el Acusado entiende completamente el contenido del convenio.*

[signature] 8-13-25

Defense Attorney's Signature / *Licenciado* Date / *Fecha*

Michael Celso Gonzalez

Defense Attorney's Name - Printed / *Licenciado*

(Revised 11/23/15)